**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JODY JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:07-CV-861 CAS |
| | ) | |
| U.S. BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq. ("FMLA"). Plaintiff Jody Jordan alleges that defendant U.S. Bank ("defendant" or "the Bank") violated the FMLA when it terminated her employment after she returned from FMLA leave for a serious health condition. This matter is before the Court on defendant's motion for summary judgment. Plaintiff opposes the motion, defendant has filed a reply, and the matter is fully briefed. For the following reasons, the Court will grant the motion for summary judgment.

**Summary Judgment Standard**.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then

shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

"Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." King v. Hardesty, 517 F.3d 1049, 1057 (8th Cir. 2008) (quoted case omitted).

With these standards in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.

**<u>Facts</u>.**[1]

---

[1]The Court notes that in compliance with Local Rule 4.01, the Bank submitted a Statement of Uncontroverted Facts ("SOF") in support of its motion for summary judgment, which sets forth each fact in a separately numbered paragraph, with appropriate citations to the record. (Doc. 18). Plaintiff responded by filing her own Statement of Facts (Doc. 21, ex. 1), which includes a separate listing of "Plaintiff's Statement of Disputed Facts From Movant's Listing of Fact." At times, plaintiff supports her Statement of Disputed Facts From Movant's Listing of Fact by citing to her own Statement of Facts. The Bank responded to plaintiff's Statement of Facts and filed a reply in support of its own SOF, so the Court was presented with five separate documents addressing factual issues, rather than the two contemplated by Local Rule 4.01. This abundance of factual statements and the confusion engendered by plaintiff's citation to her own Statement of Facts as support for her Statement of Disputed Facts has not assisted the Court in its task of determining the facts.

Federal Rule of Civil Procedure 56(e) requires an opposing party to set forth specific facts through affidavits or other admissible evidence showing that there is a genuine issue for trial. Local Rule 4.01(E) requires an opposing party to set forth disputed facts with specific references to the record. All facts not specifically controverted by the opposing party are deemed admitted under Local Rule 4.01(E). See <u>Deichmann v. Boeing Co.</u>, 36 F. Supp. 2d 1166, 1168 (E.D. Mo. 1999); <u>see also</u> <u>Reasonover v. St. Louis County, Mo.</u>, 447 F.3d 569, 579 (8th Cir. 2006). The "concision and specificity required" by local rules such as Local Rule 4.01(E) "seek to aid the district court in passing upon a motion for summary judgment, reflecting the aphorism that it is the parties who know the case better than the judge." <u>Libel v. Adventure Lands of Am., Inc.</u>, 482 F.3d 1028, 1032 (8th Cir. 2007) (cited case omitted).

Plaintiff does not dispute and therefore admits paragraphs 1, 3-10, 13-14, 16-19, 21-30, 34-38, 40-51, 55, and 68-69 of the Bank's SOF. Plaintiff objects to or disputes a number of the other paragraphs, but most of her responses are not well taken or do not otherwise raise an issue of material fact. Plaintiff's objections to paragraphs 11-12 are not well taken, because these documents were in the Bank's possession at the time it was investigating plaintiff. The Court will exclude paragraph 15 from its consideration of the facts. Plaintiff's objection to paragraph 20 is misplaced, as plaintiff testified that she understood how the number of checks that bounced could be viewed as check kiting. Plaintiff's objections to paragraphs 31-33 do not constitute a denial of the facts alleged therein. Plaintiff's objection to paragraph 39 contradicts her own testimony. Plaintiff's response to paragraph 52 is not a proper denial or objection. Plaintiff does not deny the facts in paragraph 53 and 54 but merely testifies that she had no recollection of the request. Plaintiff's response to paragraph 56 mischaracterizes Mr. Sweeney's testimony. Mr. Sweeney testified that he did not have specific recollection of each and every conversation with Mr. Litzsinger, but testified that he kept Mr. Litzsinger apprised of plaintiff's account status. Mr. Litzsinger similarly testified that Mr. Sweeney kept him apprised of plaintiff's account status.

Plaintiff's responses do not dispute the facts in paragraphs 57 and 58. Plaintiff's responses to paragraphs 59 and 60 do not dispute the facts alleged therein, and fail to acknowledge that the Bank supplemented its interrogatory answers to state that Kathleen Deno participated in the decision

Plaintiff began working for the Bank as a teller in its Ellisville, Missouri branch in October 2005. Plaintiff opened a checking account at the Bank, although maintaining an account at the Bank is not required of any employee. While employed at the Bank, plaintiff also held accounts at Farmers State Bank and the Bank of North Georgia, and had a home equity line of credit from First Horizon Bank on which she could write checks. First Horizon Bank ultimately closed plaintiff's account because she exceeded her available credit limit.

As a condition of employment, all employees of the Bank are required to comply with its Code of Ethics and Business Conduct ("the Code"). Plaintiff received a copy of the Code when she began her employment and certified her compliance with that Code annually during her employment. Plaintiff understood that the Bank expected her to follow the Code as a condition of her employment.

---

to terminate plaintiff's employment. Plaintiff's response to paragraph 61 does not dispute that Mr. Litzsinger testified as stated by the Bank, but mischaracterizes Mr. Schoene's testimony, ignoring the fact that he testified many times in his deposition that he terminated plaintiff based on Mr. Litzsinger's instruction or suggestion. The Court notes Mr. Schoene's inconsistent statements in its recitation of the facts. Plaintiff's response to paragraph 62 does not dispute that the Bank has terminated thirteen employees for account irregularities in this region, but merely cites Mr. Schoene's testimony that he knew of no one other than plaintiff who was terminated at his branch on similar grounds. Plaintiff's response to paragraph 63 does not dispute the facts asserted therein, but rather focuses on the inconsistency in Mr. Schoene's testimony as to whether he made the decision to terminate plaintiff's employment in February 2007 or whether he acted on Mr. Litzsinger's recommendation. Plaintiff's reliance on Mr. Schoene's decision to retain her as an employee in November 2006 does not serve to dispute this fact.

Plaintiff's response to paragraph 64 is a mere disagreement with word selection. Plaintiff admits that her leave ended on February 27, 2007 and that she returned to the Bank on February 28, 2007. Plaintiff's response to paragraph 66 misrepresents Mr. Schoene's testimony about her termination, failing to acknowledge that on multiple occasions he testified that Mr. Litzsinger had informed him the decision to terminate plaintiff had been made by Mr. Litzsinger and Ms. Deno. Plaintiff's objection to paragraph 67 is not well taken to the extent that the three checks she wrote to herself from her Farmers State Bank account in October and November 2006, which bounced, were in the Bank's possession at the time it was investigating plaintiff. The Court will exclude paragraphs 70-71, which concern post-termination events, on the basis that the fact asserted therein are not relevant to the termination.

The Code reads, in relevant part: "U.S. Bank employees' personal financial matters should be handled with prudence at all times . . . . Employee privileges carry the responsibility of prudent use, prompt payment, and care to follow all guidelines and reimbursement procedures."

### 1. Plaintiff's Account Activity

Plaintiff's Bank checking account statement for the September 16, 2006 through October 16, 2006 period showed she was overdrawn twelve of thirty-one days and ended the statement period with a negative balance of $678.94. Between September 16, 2006 and October 16, 2006, plaintiff's account was overdrawn up to $1,250. Plaintiff knew she was accruing overdraft and returned check fees. In September and October of 2006, plaintiff's account status continued to deteriorate. For the period October 17, 2006 to November 14, 2006, plaintiff was overdrawn nearly every day, with only four days in the account period showing a positive account balance.

On October 30, 2006, plaintiff wrote a check from her First Horizon account for $750 and deposited it at the Bank. The check subsequently bounced. On October 30, 2006, plaintiff wrote a check to herself in the amount of $109 from her Bank of North Georgia account, which bounced. In addition, transactions dated November 3 and 5, 2006, show that plaintiff deposited at least three checks she wrote from her Farmers State Bank account into account at the Bank. Farmers State Bank returned all three checks for insufficient funds. Plaintiff also cashed a check written from her Farmers State Bank account at the Bank on November 7, 2006. Like the others, this check was returned for insufficient funds.

### 2. The Bank's Investigation into Plaintiff's Account Activity

In early November 2006, plaintiff's branch manager, Mark Schoene, reviewed plaintiff's account activity and became concerned about the number of checks she was bouncing from her Bank

account and that the checks she was depositing into her Bank account were being returned. Based on the suspicious activity in plaintiff's account, Mr. Schoene, who had held the position of branch manager for only four months, contacted Jeffrey Litzsinger, a Bank Human Resources manager, for suggestions on what to do about the situation. Relying on Mr. Litzsinger's guidance, on or about November 7, 2006, Mr. Schoene contacted Bank senior investigator Dave Sweeney and expressed concern that numerous checks that plaintiff deposited into her account had been returned.

Mr. Sweeney told Mr. Schoene that, based on the information available to him at the time, he believed plaintiff's account activity indicated she was violating the law. Plaintiff testified that she understood how the number of checks she wrote to herself that bounced could be viewed as check kiting, and admitted it was not unreasonable for Bank officials to question her about check kiting.[2]

The Bank opens investigations anytime an employee has a negative balance in an account, but the scope of the investigation is based on the severity of the negative balance and the length of time it is negative. After Mr. Sweeney received notice of plaintiff's account activity on November 7, 2006, he researched plaintiff's accounts and pulled the checks that had been returned. As an investigator with the Bank, Mr. Sweeney was required to conduct and complete an investigation and file a suspicious activity report regarding plaintiff's account activity within thirty days of receiving notice of potential illegal account activity. See 12 C.F.R. § 353.3(a), (b). After this research, Mr. Sweeney arranged for a meeting with Mr. Schoene, plaintiff and Mr. Sweeney.

---

[2]A check kiting scheme "is a systematic depositing of nonsufficient funds checks into one or more accounts, which causes the bank balance on the official books and records of that bank to be increased, to be inflated." United States v. Whitehead, 176 F.3d 1030, 1035 (8th Cir. 1999). "Check kiting is an ongoing scheme which depends upon the delay in the check collection process." United States v. Scott, 554 F.2d 866, 867 (8th Cir. 1977).

Shortly before the meeting, on November 15, 2006, plaintiff attempted to deposit a $750 check she wrote to herself into her personal Bank checking account. That check was returned for insufficient funds. On November 16, 2006, Mr. Schoene and Mr. Sweeney met with plaintiff to discuss their concerns that she was kiting checks. Plaintiff knew at the time of this meeting that there were serious problems with her account. At the meeting, Mr. Schoene and Mr. Sweeney presented plaintiff with the returned checks from October and November. Plaintiff signed a statement indicating that she had been having financial difficulties, including the loss of her husband's income, that added to the cycle of insufficient funds and returned check charges. In her statement, plaintiff wrote:

> I like working for U.S. Bank and hope to continue with my career with you. I will close my account if need be and start over with transferred direct deposit from both my work and my husband … I find myself in a no win situation to catch up now. But that does not mean I was transferring bad checks to remedy this. Please accept my apology and I will do my best to fix this situation.

During the meeting on November 16, 2006, plaintiff assured Mr. Schoene and Mr. Sweeney that she would resolve the situation right away.

Mr. Schoene believed that he had grounds to terminate plaintiff's employment at the time of the November 16, 2006 meeting, but chose not to fire her. At the end of the meeting, plaintiff asked Mr. Schoene if she still had a job. Mr. Schoene replied, "Let's not worry about that." Mr. Schoene added, "It's up to you whether you tell anybody here what has happened, but as far as I'm concerned, it is taken care of." Mr. Schoene worked with plaintiff to set up a plan for her to repay what she owed to the Bank, and Mr. Schoene had further conversations with her about how she should handle her problems with her checking and savings accounts.

After the meeting, Mr. Sweeney conferred with Jeffrey Litzsinger in Human Resources to determine the next steps, because he could not tell based on plaintiff's statements at the meeting

whether or not she had been kiting checks through her Bank account. Mr. Sweeney continued to monitor plaintiff's account because he was obligated to continue and conclude his investigation within thirty days and because the issue of whether plaintiff was kiting checks remained unresolved.

### 3. Plaintiff's Injury and Leave

Plaintiff was off work beginning November 19 and did not return to work until November 24, 2006. On December 7, 2006, plaintiff broke her leg in a fall at her home. Once admitted to the hospital, plaintiff called Mr. Schoene, who gave her information about how to contact the Bank's disability insurer, Hartford Insurance, which manages and administers FMLA claims for the Bank. As a result of her injury, plaintiff was in a cast for sixteen weeks, using crutches for twelve weeks and then a walking cast and a cane for a month. The injury left plaintiff unable to work, so she subsequently took a FMLA leave of absence to recover until February 27, 2007.

Plaintiff received her notice of rights under the FMLA. No one from the Bank contacted plaintiff to challenge her need to take time off or called her during the leave to complain about her time off. During her leave of absence, plaintiff received short-term disability pay from an insurance policy obtained through her employment at the Bank, which consisted of eighty percent (80%) of her pay. The Bank provided plaintiff with all of the leave she requested under the FMLA.

### 4. Plaintiff's Banking Activity During her Leave

Although plaintiff was unable to work at the Bank from December 7, 2006 to February 27, 2007, she came in to the Bank as a customer. During her leave, plaintiff came into the Ellisville branch every two weeks and continued to withdraw money directly deposited into her account by her husband's employer. On one of these occasions, Mr. Schoene asked plaintiff when she was coming back, because the Bank was short handed.

Plaintiff's checking account statement for the period November 15, 2006 through December 14, 2006 was overdrawn on her account every day except one day, December 8. In addition, plaintiff's savings account balance with the Bank became more overdrawn. When she first met with Mr. Sweeney and Mr. Schoene in November 2006, her account balance was overdrawn by approximately $770; by December 14, 2006 her balance was overdrawn by $1554.41.

During the period from November 17, 2006, after plaintiff met with Mr. Sweeney and Mr. Schoene, until December 14, 2006, plaintiff accrued twenty-eight returned check charges and two stop payment fees. For the period of November 16, 2006 until December 8, 2006, plaintiff wrote twelve bad checks totaling $826.75 in value. On December 8, 2006, plaintiff's account activity showed that five stop payments had been placed on checks written from plaintiff's account on December 8, 2006.

Plaintiff admits she took no new measures to prevent her checks from bouncing. As a result of the account activity that continued after the November 16 meeting, Mr. Sweeney continued his investigation into plaintiff's account. In addition, Mr. Sweeney placed a "hard hold" on the account which prevented plaintiff from withdrawing any additional funds from the account until her debts to the Bank were satisfied. On December 22, 2006 after the hard hold was placed on plaintiff's account and after she unsuccessfully attempted to withdraw funds while on her leave, plaintiff called Mr. Sweeney requesting he remove the hard hold so she could make another withdrawal. After consulting with Mr. Schoene, Mr. Sweeney released the hard hold.

At that time, in December 2006, the issue of whether plaintiff was committing check kiting remained unresolved. When plaintiff called Mr. Sweeney on December 22 in an attempt to get the Bank to release the hold on her account, Mr. Sweeney requested that plaintiff provide him with

copies of bank statements from her other accounts from which checks had been returned, to allow her to clear up any suspicion of check kiting.[3]  Plaintiff never provided the statements to the Bank.

### 5.  *The Decision to Terminate Plaintiff's Employment*

Mr. Sweeney kept Mr. Litzsinger apprised of plaintiff's Bank account activity throughout the investigation.  In mid-February 2007, Mr. Litzsinger spoke with Mr. Sweeney again about plaintiff's account activity and learned about the additional issues that had arisen since plaintiff's leave commenced:  Mr. Sweeney reported that plaintiff continued to pass bad checks, put a number of stop orders on checks she had written when her account was overdrawn, had not provided statements from her other bank accounts, and had not brought her accounts into good standing as she had promised to do.

On or about February 19, 2007, Mr. Litzsinger took this information to Kathy Deno, District Operations Manager for the Bank's West District.  Mr. Litzsinger and Ms. Deno discussed the fact that plaintiff failed to bring her account into good standing, she continued to bounce checks, and she failed to provide documents that were requested which would have resolved the suspicion of check kiting.  Mr. Litzsinger and Ms. Deno together concluded that plaintiff's employment needed to be

---

[3] Mr. Sweeney testified that check kiting can only be proved or disproved by comparing an individual's personal checking accounts. Sweeney Dep. 89:18-23.  Plaintiff testified that check kiting is "[i]ntentionally depositing checks that are overdrawn on one account to cover checks drawn on another account."  Jordan Dep. 76:21-77:1.  Plaintiff testified that she did not intentionally deposit checks that were overdrawn, because she assumed there were funds in her account to cover the checks that she wrote.  Id. at 77:4-8.

Plaintiff testified that she "does not recall" Mr. Sweeney asking for her bank statements from her other accounts.  Plaintiff was asked, "So, if I told you, if they testified that they asked you for the bank statements from your other accounts, are you telling me they would be lying or that you just don't remember them asking you?"  Plaintiff responded, "I don't remember, no."  Jordan Dep. 82:1-5.  Plaintiff's testimony therefore does not dispute the Bank's assertion that it asked for her bank statements from other accounts.

terminated in order to maintain the Bank's ethical standards and not jeopardize its FDIC insurance, and that Mr. Litzsinger would communicate this conclusion to Mr. Schoene.[4]  Specifically, Mr. Litzsinger testified as to the following reasons for reaching the decision that plaintiff's employment should be terminated:

> [I]t was a combination of all of the things.  It was the bad checks, it was the theft, fraud and the dishonesty, it was a violation of our Code of Ethics.  We could not have an employee working here at the bank that violated all of those things, so, somebody who can't manage their own account, we certainly don't want them managing other people's accounts, either.

Litzsinger Dep. 50:8-15.

The decision to terminate plaintiff's employment was consistent with the Bank's personnel practices in similar circumstances.  Since 2004, thirteen employees in the immediate region of the Bank were terminated for account irregularities.  Of those thirteen employees, five were terminated for suspicion of check kiting.

Although plaintiff's conduct in mid-February 2007 warranted immediate dismissal, Mr. Litzsinger decided not to discharge plaintiff immediately because she was still on medical leave and he did not want her paid benefits to terminate while she was unable to look for new work.  At some point in mid-February, Mr. Schoene called Mr. Litzsinger for assistance in filling out a Physical Demands Analysis form that Mr. Schoene had received from the Bank's short-term insurance provider, Hartford Insurance.  See Pl.'s Ex. 6  The form sought information about the physical difficulty involved in plaintiff's job as a bank teller, in preparation for her return to work.  It was

---

[4]Plaintiff, at several points in the summary judgment briefing, objects that Mr. Litzsinger did not list Ms. Deno in an interrogatory response as a participant in the decision to terminate plaintiff's employment.  Plaintiff fails to acknowledge that the interrogatory answer was supplemented, identifying Ms. Deno as a decisionmaker, prior to defendant's filing of the motion for summary judgment.  Plaintiff's continued reliance on the original interrogatory answer is misplaced.

during this conversation that Mr. Litzsinger informed Mr. Schoene the decision had been made to terminate plaintiff's employment and/or suggested to Mr. Schoene that plaintiff's employment should be terminated because of her continued improper account activity.

Plaintiff returned to the Bank on February 28, 2007 upon the conclusion of her approved medical leave, after having received a call from Hartford Insurance advising her to return to work. Mr. Schoene, acting primarily on the advice and suggestion of Mr. Litzsinger, terminated plaintiff's employment with the Bank on February 28, 2007. On the same day, Mr. Schoene prepared a memo which stated in part,

> Jody Jordan had been on leave since the beginning of December and I had recently gotten an email from The Hartford that she could return to work provided that we make certain accommodation, namely that she sit while at work. After consulting with my HR rep we felt that we could meet those accommodations, however due to earlier security problems with Jody we were planning on letting her go anyway.

> Today, 2/28/2007, Jody returned to work and myself and my Assistant Manager Jessica Griffin brought Jody into the office and made her aware that she was being terminated for the security issues that were happening previous to her leave. She stated that she wasn't surprised, and then mentioned that she wasn't planning on coming back to work anyway. Jess and I didn't respond and she asked why it wasn't communicated to her earlier. I stated that since the previous investigation with David Sweeney other things had happened, and since Mr. Sweeney asked for the statements of the accounts involved in the security issue and those weren't provided, we had to let her go.

Pl.'s Ex. 7.

Mr. Schoene somewhat testified inconsistently in his deposition, sometimes stating that he made the decision to terminate plaintiff's employment, but also testifying at least twelve times that he terminated plaintiff on the recommendation of Mr. Litzsinger. Mr. Schoene testified at different points that he terminated plaintiff's employment because Mr. Litzsinger told him the decision to terminate plaintiff had been made, because Mr. Litzsinger recommended her termination, because of

plaintiff's account activity prior to her injury, and because of continuing account activity subsequent to plaintiff's injury that Mr. Litzsinger informed him about.

The Declaration of Ms. Deno, the Bank's District Operations Manager for the West District, states in part that while Mr. Schoene ultimately had responsibility for executing personnel decisions for the Bank's Ellisville branch in February 2007, she was ultimately responsible for the Bank's compliance program for the region that included Mr. Schoene's bank, and she would have ensured that plaintiff's employment was terminated if Mr. Schoene did not, based on plaintiff's account activity that occurred after November 16, 2006:

> For a personnel matter involving such serious compliance violations by an employee, Mr. Schoene would not have had the authority to override the decision made by Mr. Litzsinger and me. If Mr. Schoene had not terminated Ms. Jordan following our decision, I would have escalated the personnel matter to ensure that Ms. Jordan's employment did not continue due to the seriousness of the violations discovered following the November 16, 2006 meeting.

Deno Decl. at 4, ¶ 17.

Plaintiff testified the reason she believes her termination was related to her FMLA leave is because she was told in November 2006 that her account activity would not affect her job, and she was not given any other reason for her termination apart from her account activity. Plaintiff testified she assumed she was terminated because she took so much time off of work and Bank officials thought she was incapable of doing her job, but admitted no one ever told her that.

**Discussion**.

### A. The Bank's Argument in Support of Summary Judgment

The Bank seeks summary judgment on plaintiff's claim that her termination violated the FMLA, asserting that plaintiff cannot dispute the facts that led it to terminate her employment for legitimate reasons unrelated to her medical leave of absence. The Bank asserts that the series of

events which led to plaintiff's discharge began in the fall of 2006, before her medical leave commenced, when it noticed that plaintiff's checking account was overdrawn for nearly half of the days in a statement period. When plaintiff's branch manager and a Bank investigator reviewed her account history, they discovered suspicious account activity which led to a serious concern that plaintiff was engaged in check kiting. On November 16, 2006, plaintiff, her manager and the investigator met to discuss the improprieties in her account. At the meeting, plaintiff denied any check kiting activity, agreed to bring her account into good standing, and agreed to pay back the debts she owed to the Bank for overdraft fees.

Not long after the meeting, plaintiff injured herself and requested FMLA leave from December 7, 2006 through February 28, 2007. Despite her assurances and promises made to the Bank at the November 16, 2006 meeting, plaintiff continued to write and deposit bad checks and to bounce checks from her Bank account during her medical leave. Plaintiff also failed to repay the overdraft fees she owed. In mid-February 2007, a Bank District Operations Manager and Human Resources Manager concluded that plaintiff's continued misuse of her checking account warranted termination. Because plaintiff's previously-approved FMLA leave was nearing completion, the Bank allowed her to fully recuperate and terminated her after she was able to return to work. The Bank asserts that plaintiff was terminated on February 28, 2007 based solely on her improper, and perhaps unlawful, use of her checking account that violated the Bank's Code of Ethics and Business Conduct.

### B. Plaintiff's Opposition

In response, plaintiff states that when she met with her branch manager, Mr. Schoene, in November 2006 about the problems with her account, he assured her that she still had a job and that as far as he was concerned, the problem was taken care of. Subsequently, Mr. Schoene let plaintiff

know that he would retain her as an employee despite the facts regarding her financial and over-drafting problems that were discussed at the November meeting. Shortly thereafter, plaintiff took FMLA leave and, during her leave, went to the Bank to make deposits. Mr. Schoene again assured her of her position with the Bank and asked when she was coming back. Nonetheless, when she returned to work on February 28, 2007, she was immediately terminated.

Plaintiff's response makes clear her claim is that the Bank terminated her employment in retaliation for her use of FMLA leave.[5] Plaintiff asserts that she establishes a prima facie case of FMLA retaliation because her medical leave was a protected activity under the FMLA, she suffered an adverse employment action when she was terminated, and a causal connection exists between her use of FMLA leave and her termination based on the close temporal proximity between her return to work and her firing.

In support of her claim, plaintiff asserts that the Bank has offered many different and contradictory justifications for her termination, and differing and inconsistent accounts as to who decided to terminate her. Plaintiff also asserts that there is evidence Mr. Schoene and the Bank considered her injury and medical leave in relation to her termination.

---

[5]Plaintiff's complaint did not specify whether she was alleging that the Bank interfered with her FMLA leave in violation of 29 U.S.C. § 2615(a)(1), or discriminated against her for exercising her rights under the FMLA in violation o 29 U.S.C. § 2615(a)(2). See Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006), for a discussion of the two types of claims under the FMLA.

**C. The Bank's Reply**.

The Bank replies that although plaintiff admits she was provided another opportunity to save her job prior to her medical leave, she continued to engage in numerous, egregious account improprieties during her leave, and makes the baseless assumption that it was not her misconduct but rather her medical leave that motivated the Bank to terminate her. The Bank asserts that plaintiff has not met her burden to establish a prima facie case of retaliation because she has no facts to prove causation, other than the temporal proximity between her FMLA leave and her termination.

The Bank further asserts that even if plaintiff can establish a prima facie case of retaliation based on temporal proximity, she cannot use that proximity to rebut its legitimate reasons for her termination. The Bank asserts that the fact its investigation commenced before it knew plaintiff would be taking FMLA leave undercuts the significance of the temporal proximity. The Bank also discounts plaintiff's reliance on the fact that she was not terminated when she met with Mr. Schoene and Mr. Sweeney in November 2006, suggesting that plaintiff viewed this reprieve as a "blank check" to commit further misconduct without fear of reprisal. The Bank states that plaintiff admits after she made a written assurance to the Bank that she would immediately resolve the situation with her account, she wrote at least twelve more bad checks totaling over $800 in value, placed five stop payments on checks she wrote to local merchants, accrued twenty-eight returned check charges and two stop payment fees, and increased her debt to the Bank by an additional $800.

Finally, the Bank states that plaintiff does not dispute the truth of each of the reasons articulated by the multiple Bank's witnesses who participated in her termination, but instead suggests that because each participating individual considered one or more legitimate factors, the Court should conclude that there is some dispute as to the reason for her termination. The Bank asserts that each

of the reasons its witnesses offer for plaintiff's termination relates directly to plaintiff's abuse of privileges associated with her bank account, which began prior to her FMLA leave and continued during the leave.

**D. FMLA Retaliation**.

The FMLA prohibits employers from discriminating against employees for asserting rights under the Act. 29 U.S.C. § 2615(a)(2); Stallings v. Hussmann Corp., 447 F.3d 1041, 1051 (8th Cir. 2006). An employer cannot consider an employee's use of FMLA leave as a negative factor in an employment action. Id. Basing an adverse employment action on an employee's use of FMLA leave is therefore actionable. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002).

To establish a prima facie case of retaliation under the FMLA, plaintiff must demonstrate that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action. Smith, 302 F.3d at 832. The Eighth Circuit has described the actual evidentiary burden that a plaintiff must meet at the prima facie stage as "minimal." Stewart v. Independent Sch. Dist. No .196, 481 F.3d 1034, 1043 (8th Cir. 2007).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions. If the employer can articulate such a reason, the burden shifts back to the employee to demonstrate that the employer's proffered reason is pretextual. See Smith, 302 F.3d at 832 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)). To establish pretext, the plaintiff "must present evidence that (1) creates a question of fact regarding whether [the defendant's] reason was pretextual and (2) creates a reasonable

inference that [the defendant] acted in retaliation." Hite v. Vermeer Mfg. Co., 446 F.3d 858, 865 (8th Cir. 2006) (internal punctuation and cited case omitted; brackets in original).

The Supreme Court has recognized that at the final stage of the burden shifting analysis, the plaintiff's burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional [retaliation]." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006) (quoting Texas Dept. of Cmty. Affairs v. Burdine, 459 U.S. 248, 255 (1981)). "In making a showing at this final stage, evidence used to support the prima facie case is considered along with other evidence before the court to determine whether there exists a triable fact on the ultimate issue of retaliation." Wallace, 442 F.3d at 1120 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

### 1. *Plaintiff's Prima Facie Case*

There is no dispute that plaintiff satisfies the first two elements of the prima facie case, because she has shown that she exercised rights afforded by the FMLA, and she suffered an adverse employment action. The disputed issue is whether plaintiff can make the necessary showing on the third element of the prima facie case, that there was a causal connection between the exercise of her rights and the adverse employment action. See Smith, 302 F.3d at 832. With respect to the third element, the Eighth Circuit has stated that "the kind of causal connection required for a prima facie case is not 'but for' causation, but rather, a showing that an employer's 'retaliatory motive played a part in the adverse employment action.'" McBurney v. Stew Hansen's Dodge City, Inc., 389 F.3d 998, 1003 (8th Cir. 2005) (quoting Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002)).

As evidence of causation, plaintiff relies solely on the fact that the Bank fired her on the very day she returned from FMLA leave. Plaintiff cites Gordon v. Gerard Treatment Programs, L.L.C., 390 F.Supp.2d 826, 839 (N.D. Iowa 2005), in which the district court held that where the plaintiff's termination occurred three days prior to the expiration of her FMLA leave, plaintiff established a prima facie case of retaliation because a reasonable jury could conclude from the "very close temporal proximity" that the defendant was simply waiting for the expiration of plaintiff's leave to terminate her in retaliation for having taken that leave.

The Bank responds that plaintiff cannot establish a prima facie case based on timing alone, because temporal proximity should be viewed in light of the period beginning when plaintiff's leave commenced, and the Eighth Circuit has repeatedly held that a temporal proximity of three months, i.e., from the time plaintiff took FMLA leave in early December 2006 to the time of her termination on February 28, 2007, is insufficient as a matter of law to support a causal connection of retaliation. The Bank asserts that Gordon does not calculate the temporal proximity consistent with the Eighth Circuit's analysis as demonstrated in Smith, in which temporal proximity was calculated from the beginning of the plaintiff's FMLA leave, not the end. The Bank also states that no cases have followed Gordon.

"An employee can establish a causal link between her protected activity and the adverse employment action through 'the timing of the two events.'" Hite, 446 F.3d at 866 (quoting Eliserio v. United Steelworkers of Am., 398 F.3d 1071, 1079 (8th Cir. 2005)). "A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." Smith, 302 F.3d at 832. Even in the absence of a pattern, the Eighth Circuit "has sometimes held that the timing of one incident of adverse employment action following protected

activity sufficed to establish causal connection[.]" Id. The Eighth Circuit has been clear, however, that mere coincidence of timing is rarely sufficient to establish the causation element. Haas v. Kelly Serv., Inc., 409 F.3d 1030, 1037 (8th Cir. 2005). "Cases in which we have determined that temporal proximity alone was sufficient to create an inference of the causal link 'have uniformly held that the temporal proximity must be "very close."'" Hite, 446 F.3d at 866 (quoting Wallace v. Sparks Health Sys., 415 F.3d 853, 859 (8th Cir. 2005)).

In Gordon, as in the instant case, the plaintiff did not argue that there was a "pattern of adverse actions" following her protected activity to provide an "extra quantum of evidence." Nonetheless, the district court concluded that the plaintiff's termination was a very serious adverse employment action which was sufficiently close in time to the end of her FMLA-protected leave to generate a genuine issue of material fact on the necessary causal connection, and thus satisfy the third element of the prima facie case. Gordon, 390 F.Supp.2d at 839.

As did the court in Gordon, this Court can see the persuasiveness of the argument that firing an employee the day she returns from FMLA-protected leave could be viewed by a jury as retaliatory. Further, although no cases have cited Gordon to date, it has been distinguished only by the same district judge who authored the opinion. The Bank argues that Gordon is flawed because the Eighth Circuit has instructed that temporal proximity must be calculated from the period when FMLA leave begins, but the case it cites for this proposition does not actually articulate the proposition. See Smith, 302 F.3d at 833. Rather, the fact pattern in Smith was simply that the plaintiff was terminated approximately fourteen days after she began FMLA leave.[6] The Bank has not cited any cases in which an employee was fired immediately upon return from protected leave and a court has held that

---

[6]The Eighth Circuit concluded that sufficient temporal proximity existed in Smith to establish the causation element of the prima facie case.

the causation element was not met. The Bank has not, therefore, convinced the Court that <u>Gordon</u> should be ignored.

The Court does not need to decide whether plaintiff's evidence is sufficient to establish causation, however. "[I]f an employer has articulated a legitimate reason for its actions," as here, "it is permissible for courts to presume the existence of a prima facie case and move directly to the issue of pretext and the determinative issue of causation when bypassing the prima facie case analysis leads to clarity in framing the issues[.]" <u>Stewart</u>, 481 F.3d at 1043. The Court chooses to do so in the present case.

### 2. *The Bank's legitimate, nondiscriminatory reason*

In response to plaintiff's prima facie case, the Bank has asserted as a legitimate, nondiscriminatory reason for its decision to terminate plaintiff, that plaintiff continued to engage in suspicious account activity during her leave period, in violation of Bank policy, contrary to her promises and assurances to the Bank and, possibly, in violation of the law.

The Bank states that it is undisputed it has maintained a policy requiring all employees as a condition of employment to handle their personal financial affairs prudently and responsibly, and that it seriously enforces this policy, having terminated thirteen employees, in addition to plaintiff, for similar offenses in the last four years. The Bank states that plaintiff does not deny she was legitimately being investigated for possible check kiting before her leave commenced, and when interviewed by Bank officials, she promised to rectify her financial situation and her debts to the Bank. Nonetheless, during her FMLA leave, plaintiff wrote at least twelve bad checks, placed five stop payment orders on checks written out of her Bank account, remained overdrawn, accrued twenty-eight returned check charges and two stop payment fees, and increased her debt to the Bank

by $800. After plaintiff contacted the Bank during her leave to ask that a hold on her account be released, she was asked to provide her records from other bank accounts from which she was bouncing checks to vindicate herself from the suspicion that she was kiting checks, but she failed to provide this information.

The Bank's assertions satisfy the burden placed on an employer at the second stage of the McDonnell-Douglas burden-shifting analysis to articulate a legitimate reason for the adverse employment action it took.

### 3. *Plaintiff's Showing of Pretext and Retaliation*

Under the McDonnell Douglas analysis, plaintiff must now point to some evidence that the Bank's proffered reason for her termination is pretextual. Smith, 302 F.3d at 833. Plaintiff must present evidence that (1) creates a question of fact as to whether the Bank's proffered reason was pretextual, and (2) creates a reasonable inference that the Bank acted in retaliation. See id. "To carry the burden of showing pretext," plaintiff has to show that the Bank's "justification for the firing was unworthy of credence." Id.

It is possible for strong evidence of a prima facie case to establish pretext as well. Erickson v. Farmland Indus., Inc., 271 F.3d 718, 726 (8th Cir. 2001), but in this case, plaintiff's prima facie case is not strong. The Eighth Circuit has explained that temporal proximity sufficient to create a prima facie case of discrimination will not necessarily be sufficient to show that the defendant's proffered reason was pretextual. Sprenger v. Federal Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001). "An employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than it takes to make a prima facie case], however, because unlike

evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." Sprenger, 253 F.3d at 1111.

Plaintiff attempts to establish pretext based on the fact that she was not fired in November 2006 when the Bank brought the problems with her account to her attention, but was later fired, immediately following her medical leave, for the same conduct that did not justify her firing earlier. Plaintiff's argument ignores the fact that after she went on medical leave, she continued to engage in account activity that she was told was improper and had promised to stop. The record is clear that although Mr. Schoene decided not to fire plaintiff in November 2006, the Bank's investigation continued on. The fact that plaintiff was not fired for the improper account activity that came to light in November 2006 does not immunize her from repercussions for improper account activity that took place after that date.

Taking into account the nature and magnitude of plaintiff's improper account activity, which the record shows could have put the Bank into a difficult position with bank regulators, the sole fact that she was fired at the same time she returned from FMLA leave cannot support an inference of pretext. This is all the more true in light of another significant fact. Before plaintiff went on leave, Mr. Schoene talked to her about the problems with her account, which plaintiff admits could reasonably be viewed as possible check kiting, and obtained her promise that she would stop the improper account activity and pay her debts to the Bank. "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." Smith, 302 F.3d at 834. After the discussion with Mr. Schoene, however, plaintiff continued the improper account activity. Plaintiff's prima facie case therefore does not establish pretext.

Plaintiff attempts several other methods of proving pretext. First, plaintiff attempts to challenge the testimony of Mr. Schoene, the branch manager, by contending that because Mr. Schoene testified he had his own reasons to concur with the termination decision, none of the motivating factors considered by Mr. Litzsinger or Ms. Deno can be viewed by the Court as part of the legitimate, nondiscriminatory reason for plaintiff's termination. Plaintiff relies heavily on the fact that Mr. Schoene testified at one point that he terminated plaintiff's employment because of her account activity that was ongoing in October and November 2006, but this ignores Mr. Schoene's testimony, and that of Mr. Litzsinger and the Declaration of Ms. Deno, that the decision to terminate plaintiff's employment was based on the continuing account activity that occurred following the November 2006 meeting.

Plaintiff's characterization of Mr. Schoene's testimony is contrary to the undisputed evidence. Mr. Litzsinger testified that he monitored the investigation into plaintiff's account activity while she was on leave by conferring with investigator Mr. Sweeney. That Mr. Sweeney and Mr. Schoene may not have talked directly about the investigation is immaterial. Mr. Litzsinger testified that he conferred with Kathy Deno about the results of Mr. Sweeney's investigation, and the two collectively agreed that plaintiff's employment must be terminated. Both Mr. Schoene and Mr. Litzsinger testified that when Mr. Schoene called Mr. Litzsinger to discuss plaintiff, Mr. Litzsinger told Mr. Schoene that the decision had been made that plaintiff's employment should be terminated, and/or recommended that her employment should be terminated. Both men also testified that Mr. Litzsinger told Mr. Schoene about the facts that had been discovered during plaintiff's leave. Mr. Schoene testified that those facts factored into the termination decision, although he also testified repeatedly that he relied on Mr. Litzsinger's experience and judgment and merely followed his counsel in

terminating plaintiff. It is undisputed that Mr. Litzsinger and Ms. Deno's original termination decision was made because of the account improprieties committed by plaintiff after the November 16 meeting, which came to light after her leave commenced. This evidence does not sufficiently undermine the Bank's justification to create a material question of fact as to pretext.

Plaintiff next contends that the Bank offered multiple, inconsistent reasons for her termination that contradict its assertion that plaintiff committed unlawful account activity or violated the Bank's Code of Ethics. Specifically, plaintiff asserts that (1) Mr. Schoene wrote in a memorandum after the termination that Mr. Sweeney had asked for bank statements from plaintiff's other accounts, and because they were not provided, "we had to let her go"; and (2) Mr. Schoene was upset that plaintiff did not come into the bank while she was on FMLA leave to add $200 to her account, which he believed she had agreed to do.

First, both of the reasons cited by Mr. Schoene are directly related to plaintiff's account activity and are not inconsistent with the Bank's explanation for her termination, but rather are additional aspects of the same behavior. Cf. Smith, 302 F.3d at 835. Mr. Litzsinger also testified that Mr. Sweeney reported to him that plaintiff failed to provide the account statements that Mr. Sweeney had requested, and this was a factor in Mr. Litzsinger's decision that plaintiff should be terminated.

Second, Mr. Schoene's reasons for believing that plaintiff's employment should be terminated should not be viewed in a vacuum. The record is clear that Mr. Schoene was not the sole decisionmaker and that he relied on the information provided to him by Mr. Litzsinger concerning additional account improprieties discovered during plaintiff's leave, and on Mr. Litzsinger's recommendation that plaintiff be terminated. The memorandum plaintiff quotes from also states that Mr. Schoene told plaintiff "since the previous investigation with David Sweeney other things had

happened," implicitly referencing additional account activity. Further, even if Mr. Schoene was the sole decisionmaker, and his only reasons for terminating plaintiff were that she did not provide the bank statements Mr. Sweeney asked for and because she did not repay her debts, those reasons would not create an inference of pretext.

Plaintiff was not required to maintain an account at the Bank as a condition of her employment, but chose to do so. Plaintiff continued to physically visit the Bank twice a month to make withdrawals during her FMLA leave. Plaintiff knew that her consumer activity had to be handled responsibly pursuant to the Bank's Code of Ethics. Mr. Schoene was therefore free to consider plaintiff's failure to honor her repayment obligations in his own evaluation of whether plaintiff's employment should be terminated.

Finally, while Mr. Schoene's testimony reflected that he believed the decision to terminate plaintiff's employment rested with him, it is undisputed that had Mr. Schoene decided to retain plaintiff in February 2007, Ms. Deno, who was responsible for the Bank's compliance efforts in the region including Mr. Schoene's branch, would have made sure that plaintiff's employment was terminated, because her account activities posed too great a threat to the Bank's compliance obligations. This evidence fails to establish a material issue of fact with respect to pretext.

Next, plaintiff asserts that the Bank's records reflect other motives for her termination, and indicate that (1) branch manager Mr. Schoene and investigator Mr. Sweeney challenged the veracity and the severity of plaintiff's injury, (2) Mr. Schoene had concerns about whether plaintiff took appropriate leave beyond a certain date, and (3) the Bank had concerns about physically accommodating plaintiff upon her return from FMLA leave.

Plaintiff states that Mr. Sweeney's note states, "Schoene requested a doctor's note from Jordan, which she did provide. However, it only indicated that Jordan should be restricted to light duty or work. . . . Schoene attempted to obtain clarification from H.R. in reference to this situation, and the recent activities related to Jordan's account." Plaintiff also states that Mr. Schoene testified he discussed the doctor's note and/or plaintiff's injuries with the Bank's Human Resources representative.

The Sweeney note contains nothing more than factual observations and raises no inference that the Bank challenged the severity of plaintiff's injury, or that any of Mr. Sweeney's investigation was influenced by the fact that plaintiff took FMLA leave. Mr. Sweeney testified that he conducted his investigation consistent with his normal practices in investigating employees and consumers suspected of misconduct, and although he was aware of plaintiff's FMLA leave, that fact did not affect or change his investigation practices.

To the extent a doctor's note states only that an employee should have light duty, it is unremarkable that a manager would seek clarification that the injury requires the employee to be off of work entirely. Moreover, the record is undisputed that the Bank's outside insurance company, Hartford Insurance, managed plaintiff's medical leave, and that plaintiff was determined to be entitled to medical leave. The fact that plaintiff's branch manager, Mr. Schoene, discussed the doctor's note and/or plaintiff's injuries with the Bank's H.R. representative is also unremarkable and does not raise an issue of pretext. It is to be expected that a manager will need to obtain information from or provide information to a human resources representative when an employee takes extended leave. A company may make reasonable inquiry into its employees' plans. Cf. Sprenger, 253 F.3d at 1114.

With respect to plaintiff's contention that Mr. Schoene had concerns she did not return from leave at the correct time, no issue of pretext is raised. Mr. Schoene's testimony is that he received e-mails from Hartford Insurance about plaintiff, sometimes saying that her leave had been extended and that she would not return for work on a certain date, and when he received such an e-mail, he would normally contact the H.R. department for direction. Mr. Schoene also testified that he remembered getting a letter from Hartford Insurance saying that plaintiff's leave was through a certain date and plaintiff did not return to work on that date, but that "there were times when there was a delay between an e-mail and a follow-up e-mail from the Hartford." Schoene Dep. at 129:19-130:4. This testimony reflects that Mr. Schoene was relying on Hartford Insurance to let him know when plaintiff would be able to return to work, that the return date changed, and that on at least one occasion, the insurance company did not promptly notify Mr. Schoene that plaintiff's return date had changed. This evidence does not raise a genuine issue of material fact as to pretext.

Next, plaintiff contends that pretext exists because Mr. Schoene called Mr. Litzsinger for assistance with filling out a Physical Demands Analysis Form from Hartford Insurance, the Bank's outside leave administrator, in preparation for plaintiff's return, and during the same conversation, Mr. Litzsinger informed Mr. Schoene that the decision to terminate plaintiff's employment had been made. Plaintiff cites Mr. Schoene's testimony that the purpose of the call was to discuss the form, that plaintiff's broken leg "could have been discussed" during the conversation, and that "issues regarding accommodating Jordan's medical leave could have also been addressed during that conversation." Pl.'s Response at 16.

Plaintiff attempts to make too much of Mr. Schoene's testimony, because he testified that he did not recall whether he discussed with Mr. Litzsinger either plaintiff's broken leg or

accommodations upon her return to work, but merely conceded that these topics "could have been discussed." Schoene Dep. at 59:3-60-6. This discussion merely demonstrates that Mr. Schoene sought the assistance of his H.R. representative to fill out H.R.-related forms he had never seen before. It does not raise an inference that Mr. Schoene or Mr. Litzsinger bore any retaliatory motive against plaintiff for taking leave. Plaintiff appears to believe that any mention by the decisionmakers of her broken leg or the fact that she was on FMLA leave is evidence of pretext, but this is not correct. To establish pretext, a plaintiff must show both that the reason given for the employment action was false, and that retaliation was the real reason. Stuart v. General Motors Corp., 217 F.3d 621, 634 (8th Cir. 2000).

Further, Mr. Schoene's testimony was clear, as was Mr. Litzsinger's, that during this conversation Mr. Litzsinger informed Mr. Schoene the decision had been made to terminate plaintiff's employment, or suggested to Mr. Schoene that plaintiff's employment be terminated, because of continued impropriety in her account. It would be logical for Mr. Litzsinger to inform Mr. Schoene, upon receiving a call for help in preparing a form related to an employee's return to work, that the employee was going to be or should be terminated. The discussion does not support the weight of plaintiff's assertion that Mr. Schoene and Mr. Litzsinger decided to fire her during this conversation because they were concerned they could not physically accommodate her upon her return to work. It is undisputed that Mr. Schoene completed the Physical Demands Analysis form and testified that the Bank could have accommodated plaintiff's physical needs upon her return to work. This evidence does not raise a genuine issue of material fact as to pretext.

Finally, plaintiff asserts the Bank's claim that other employees were terminated on similar grounds is contradicted by Mr. Schoene's testimony that he was not aware of anyone else in his

branch who was terminated for similar reasons. Plaintiff's assertion ignores the Declaration of Ms. Deno, who has compliance responsibilities for an entire region of the Bank, that thirteen other employees were terminated for similar reasons within the past four years. This evidence does not raise an issue of pretext.

Plaintiff has not carried the burden of showing that the Bank's proffered reason for her discharge was pretext and that the real reason was retaliation for her exercise of FMLA rights.

**Conclusion**.

For the foregoing reasons, the Court concludes that plaintiff has failed to establish FMLA retaliation, and defendant's motion for summary judgment should be granted.

Accordingly,

**IT IS HEREBY ORDERED** that defendant U.S. Bank's motion for summary judgment is **GRANTED**. [Doc. 16]

An appropriate judgment will accompany this memorandum and order.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this   15th   day of July, 2008.